GOSPEL MISSIONS OF AMERICA,
a religious corporation, et al.,
Plaintiffs,

v.

George BENNETT, etc.,
et al., Defendants.

No. CV–93–1684 KMW (JGx).

United States District Court,
C.D. California.

Jan. 10, 1997.

James F. Fosbinder, Rhonda Fosbinder, Venice, CA, for Plaintiffs.

Richard S. Kemalyan, Kemalyan & Richland, L.L.P., Los Angeles, CA, for George Bennett.

James K. Hahn, City Attorney, Ronald Tuller, Assistant City Attorney, Miguel A. Dagger, Deputy City Attorney, Los Angeles, CA, for Shirley Flucus, Dr. Robert Burns.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS ON THEIR FIRST AND SECOND CAUSES OF ACTION

WARDLAW, District Judge.

This action arises out of a search for and seizure of property belonging to Gospel Missions of America ("GMA") and certain of its individual members. The search and seizure took place pursuant to a warrant that issued based upon probable cause to believe that the property was associated with an illicit charitable operation in violation of Los Angeles City and County ordinances regulating charitable solicitations. In the cross-motions for summary judgment now before the Court,

Defendants assert, and Plaintiffs challenge, the facial validity of these ordinances. This challenge requires the Court to weigh the substantial and legitimate interests of Los Angeles City and County in protecting their citizens against fraud and harassment in the solicitation of charitable funds against the well-established and fundamental free speech interests inherent in that solicitation. Having reviewed all the relevant pleadings, papers and records on file in this case, and having heard the oral argument of counsel at the April 29, 1996 hearing, the Court finds, for the reasons stated below, that certain provisions of the challenged City and County ordinances are facially invalid under the First and Fourteenth Amendments to the United States Constitution. Accordingly, the Court invalidates in part and upholds in part the Los Angeles City and County ordinances at issue, and grants partial summary judgment in favor of Plaintiffs on their first and second causes of action.

## I. BACKGROUND

GMA is a small religious and missionary organization registered as a California non-profit corporation and located in Rowland Heights, California. The individual plaintiffs are members of GMA, and were physically present at the place and time of the incidents giving rise to this action. Cmplt. ¶¶ 1, 2.[1]

On May 28, 1992, at about 7:00 a.m., approximately forty Los Angeles County Sheriffs' Deputies raided five separate properties owned or leased by GMA, located at 1803 Nausika, 1808 Nausika, 19655 Carreta Drive, 2330 Annadale Avenue, and 19521 Markstay Street, in the City of Rowland Heights, California ("the GMA properties"). Certain members of GMA, including the individual plaintiffs, resided at the GMA properties at the time of the raids.

The raids of the GMA properties were conducted pursuant to a warrant issued on May 26, 1992. The warrant was based upon an affidavit submitted and signed by George Bennett ("Bennett"), a retired peace officer and civilian criminal investigator for the Los Angeles County Sheriff's Department. County Defendants' Exhibit B. According to the affidavit, there was probable cause to believe that articles commonly found in businesses associated with the operations of illicit charitable operations, including documents, financial records, computer data, monies, illegal firearms, and illegal drugs, were located at the GMA properties. *Id.*

According to Plaintiffs, during the raids a "great deal of each of plaintiffs' property was seized, despite the fact that the only plaintiff alleged to have committed a crime and named by the warrant was Erich Wagner II." Plaintiffs further allege that the search and seizure was conducted at gunpoint, and "has had a devastatingly chilling effect upon all of them, which has resulted in damage to the church's reputation and a significant reduction in church membership in outreach activities, deprivation of property, and monetary damage as well as severe emotional and mental distress for all plaintiffs." Plaintiffs maintain that neither guns nor drugs were found pursuant to the raids, but that extensive amounts of GMA's records and files were seized.[2] Following the search and seizure, neither GMA nor any of the individual plaintiffs was arrested or charged with any crime. *See* Plaintiffs' *Memorandum of Points and Authorities in Opposition to the City and County Defendants' Motions for Summary Judgment ("Plaintiffs' Opp.")* at 4.

On January 10, 1994, Plaintiffs filed a Complaint for Injunctive and Declaratory Relief and Damages against Bennett, the Los Angeles County Sheriff's Department ("LACSD"), the County of Los Angeles ("the County"), Shirley Flucus ("Flucus"), Dr.

---

1. The individual plaintiffs are David Amador, Thomas Bayer, Warren Daly, P.J. Dibuono, Vincent Dibuono, Steven Gardner, Martin Jepsen, James Kahl, James Lalor, John Love, Ronald Prudhomme, Charles Richardson, Larry Richardson, Albin Vaznelis, Mylena Vaznelis, Ruth Washington, Paul Winn, Eric [sic] Wagner II, Brenda Wagner, Heidi Wagner, and Frederich Wagner.

2. Plaintiffs claim that, despite a court order requiring the return of all seized property, defendants have yet to return some of the seized property. Plaintiffs' Appendix at 188–89, 203–05, 240–44.

Robert Burns ("Burns"), the Los Angeles Department of Social Services ("LADSS"), and the City of Los Angeles (the "City").[3] In their first and second claims for relief, Plaintiffs allege that the Los Angeles Charitable Solicitation Ordinances, Municipal Code (L.A.M.C.) Chapter IV, Article 4, sections 44.00–44.15 ("the City ordinance"), and Los Angeles County Code (L.A.C.C.), Title 7, Divisions 1 and 2, Chapters 7.02–7.92 ("the County ordinance") are unconstitutional, both facially and as applied to Plaintiffs. Cmplt. ¶¶ 19–21, 23–25.[4] Accordingly, Plaintiffs request a declaratory judgment that the City and County ordinances are unconstitutional and seek to enjoin their enforcement. Cmplt. at 12.

On February 26, 1996, a status conference was held in this case. At that time, the Court ordered, *inter alia,* that the parties submit briefs addressing the facial constitutionality of the City and County ordinances. At the hearing of the matter on April 29, 1996, the Court asked Plaintiffs to identify the specific provisions of the City and County ordinances that Plaintiffs contend are unconstitutional. Because Plaintiffs were unable to provide an adequate response to the Court's inquiry, the Court ordered that Plaintiffs submit additional briefs identifying the allegedly unconstitutional provisions and setting forth specific authority supporting their position.

Plaintiffs did so on May 3, 1996, and, on May 10, 1996, the City and County defendants filed responsive briefs. Plaintiffs' facial attack on the City and County ordinances is now before the Court.[5] The Court will treat the parties' "trial briefs" as cross-motions for partial summary judgment pursuant to Fed.R.Civ.P. 56(a) and (b).

## II. THE CITY AND COUNTY ORDINANCES

The challenged ordinances are local legislative efforts to regulate charitable solicitations. They make it unlawful to solicit funds for charitable purposes without complying with certain registration, identification, and financial disclosure requirements. Although the City and County ordinances are similar, they are not identical. Therefore, the Court will address the provisions of each ordinance separately.

### A. The City Ordinance.

The City ordinance prohibits the solicitation of charitable contributions unless a "Notice of Intention" is filed with the Social Services Department ("the Department") 15 days before the solicitation begins.[6] L.A.M.C. § 44.04. This Notice of Intention must include detailed information regarding the purpose of the solicitation, the dates between which the solicitation will occur, a detailed financial statement, and other similar information. L.A.M.C. § 44.04. With each Notice of Intention, solicitors must also file statements of agreements made with an agent, solicitor, professional fundraiser, or manager or conductor. If the General Manager of the Department deems such statements as "not disclos[ing] for the public sufficient information concerning the facts required to be stated therein," the General Manager may request additional information. L.A.M.C. § 44.05.

In addition, all persons soliciting charitable contributions must obtain an "Information Card" from the Department, and give or exhibit the Information Card (or in printed, broadcast, or telephoned solicitations otherwise provide the information contained in the

3. The individual defendants are sued in their individual and official capacities. Bennett, LACSD, and the County are hereinafter collectively referred to as "the County defendants." Flucus, Burns, LADSS, and the City are hereinafter collectively referred to as "the City defendants."

4. Specifically, Plaintiffs allege that the County and City ordinances are "facially overbroad and in violation of the First Amendment rights to free speech, free assembly and free exercise of religion, and deny Plaintiffs of their constitutional

rights to Equal Protection and Due Process under the Fourteenth Amendment." Cmplt. ¶ 20.

5. In this Order, the Court considers only those provisions specifically challenged by Plaintiffs in their Supplemental Brief.

6. The term "charitable" is defined to "include philanthropic, social service, benevolent and patriotic, whether they are actual or purported." L.A.M.C. § 44.00(b).

Information Card) to persons solicited. L.A.M.C. §§ 44.02, 44.09. Within thirty days after the termination date of the solicitation, the solicitors are required to file a "Report of Results of Activity" detailing all receipts, expenses, and distributions of proceeds. L.A.M.C. § 44.10.

Under the statutory scheme, the Department has, *inter alia,* the following powers:

(a) To investigate statements on: (1) the Notice of Intention and information submitted in connection therewith; and (2) the Report of Results of Activity and information submitted in connection therewith;

(b) To have access to and inspect and make copies of all books, records and papers, relating to any solicitation and the distribution of any contribution received therefrom, of such person by whom or on whose behalf such solicitation is made;

(c) To investigate the method of making or conducting any such solicitation;

(d) To issue an Information Card no later than fifteen (15) days after receipt of a Notice of Intention; provided that where such notice is incomplete or otherwise fails to meet the requirements of Section 44.04 [Notice of Intention Provisions] of this Article, the Department shall within ten (10) days after receipt of the notice notify the applicant in writing of the specific information needed to meet the requirements of Section 44.04;

(e) To issue Information Cards to persons meeting the requirements of this Article which shall indicate:

(1) That same is issued as information for the public and is not an endorsement; or

(2) That same is an endorsement if (1) hereinabove is omitted and the Department endorses pursuant to Section 44.15 of this Article;

(3) The pertinent facts of the solicitation, including the commencement and termination dates;

(4) Any additional information which in the opinion of the Department will be of assistance to the public in determining the nature and worthiness of the solicitation;

(f) To maintain a constant survey of the field of charities with regard to the need and the work being done in order to secure intelligent cooperation among all charities in the City so that a comprehensive and economical plan in philanthropy may be attained;

(g) To recall and declare void any Information Card upon receipt of additional information by the Department which renders incorrect any statement set forth on such Information Card. The Department may amend or correct such statement and issue a new Information Card. Upon request, all Information Cards shall be returned to the Department within 48 hours;

. . . .

L.A.M.C. § 44.02.

The City ordinance further authorizes the Board of Social Service Commissioners ("the Board") to publish the results of investigations conducted under subsections (a), (b), and (c) of section 44.02, to publicize certain information obtained during such investigations, and to conduct hearings regarding the denials and revocations of licenses and endorsements. L.A.M.C. § 44.01.

The statute also provides that all solicitors of charitable contributions must maintain a conventional accounting system. L.A.M.C. § 44.06.

Special provisions govern "Professional Fund–Raisers and Solicitors." Section 44.14 prohibits "professional fund-raisers" from soliciting charitable contributions without a license issued by the Department.[7] L.A.M.C. § 44.14. Upon receiving an appli-

---

7. The term "Professional Fund–Raiser" is defined as any person who, "for pecuniary compensation or consideration received," solicits charitable contributions for or on behalf of any other person. L.A.M.C. § 44.00(f). "Pecuniary compensation or consideration," includes, but is not limited to, "participation on a percentage basis in any funds solicited or raised for or on behalf of any other person." *Id.* A natural person who is "a bona fide paid employee of a charitable organization endorsed by the Department" is not considered a professional fund-raiser under the article. *Id.*

cation for a professional fund-raiser license, the Department may conduct an investigation pursuant to L.A.M.C. § 44.14(d):

> The Department shall make as intensive an investigation of the applicant as it deems desirable, and shall verify:
>
> (1) That the applicant is of good character;
>
> (2) That the applicant has sufficient financial resources to be able to successfully fulfill such applicant's obligations incident to a charitable solicitation;
>
> (3) That all statements in the application are true.

The applicant is also required to post a $5,000 bond to "provide for the reimbursement for direct loss of money or property sustained through any dishonest or criminal act on the part of the applicant." L.A.M.C. § 44.14(e).

The Department shall issue a professional fund-raiser license when all conditions set forth in L.A.M.C. section 44.14 are met. If all conditions are not met, the statute provides that the application shall be denied after notice to the applicant and, if requested, a hearing held before the Board. L.A.M.C. § 44.14(f). Further, a professional fund-raiser license may be revoked if the Department finds that a solicitation is "illegal or fraudulent" or that there exists any of the grounds upon which the issuance of such license would be denied. L.A.M.C. § 44.14(g).

Additional provisions of the City ordinance exempt certain solicitations from the statutory requirements, including solicitations made solely for evangelical, missionary, or religious purposes. L.A.M.C. § 44.12. However, where any solicitation is made for evangelical, missionary, or religious purposes, but "in a manner which, in the opinion of the De-

partment, is calculated to give, or may give, the impression ... that the purpose of such solicitation is either in whole or in part charitable," the Department is authorized to investigate the matter and publicize its findings "in such a manner as it deems best to advise the public of the facts of the case." L.A.M.C. § 44.12. Finally, the Department has the power to endorse charitable organizations, and must do so if the organization requests an endorsement and complies with certain specified requirements. The Department may refuse to endorse or revoke an endorsement if those requirements are not met, subject to certain procedural guidelines. L.A.M.C. § 44.15.

The violation of any provision of the City ordinance is a misdemeanor, punishable as provided in section 11.00(m) of the Los Angeles Municipal Code.

## B. The County Ordinance.

The County ordinance similarly prohibits any person from soliciting contributions for any charitable purpose or in the name of, or on behalf of, any charitable association, unless the person first obtains an "information card" from the County or possesses a city information card which has been approved by the County. L.A.C.C. § 7.24.030.[8] It further provides certain procedures which must be followed in order to obtain an information card.[9] Under L.A.C.C. § 7.24.040, each person desiring an information card must file an application with the business license commission stating the purpose of the solicitation, the need for the solicitation, and the expenses of the solicitation, and must present extensive financial reports and other detailed information. L.A.C.C. § 7.24.040. When applying for a county information card, the applicant may submit to the commission a

---

8. Pursuant to L.A.C.C. § 7.24.030:

> A person shall not solicit within this county any contribution for any charitable purpose, or in the name of, or on behalf of, any charitable association unless such person first either obtains from the [business license] commission an information card issued pursuant to this chapter or pursuant to Ordinance 2777, entitled "An ordinance regulating the soliciting of contributions for charitable or philanthropic purposes in the county of Los Angeles,"

> adopted July 27, 1936, or possesses a city information card which has been approved by the [business license] commission pursuant to Part 2 of this chapter, or pursuant to said Ordinance 2777.

L.A.C.C. § 7.24.030. Ordinance 2777 has not been challenged in this action.

9. Applicants may obtain a temporary license through payment of a license fee. L.A.C.C. § 7.06.060.

city information card covering the same solicitation. L.A.C.C. § 7.24.060. The commission may require that the information card itself disclose certain information. L.A.C.C. § 7.24.120.

Whenever, in the opinion of the business license commission, the application does not disclose sufficient information, then, upon the request of the commission, the applicant shall file within 48 hours such additional information as the commission may specifically require. L.A.C.C. § 7.24.070.

The business license commission is authorized to act as follows:

> The business license commission may grant, deny or revoke a county information card, and may approve, disapprove or withdraw its approval of a city information card upon the same grounds and pursuant to the same procedure as licenses may be granted, denied, or revoked respectively, pursuant to Division 1 of Title 7 of this code.

L.A.C.C. § 7.24.080.[10] Moreover, L.A.C.C. § 7.24.090 provides:

> In addition to any ground of denial in Division 1 of this title, the commission may deny an information card or may refuse to approve a city information card if, because of inefficient operation, the payment of one or more salaries in amounts substantially greater than the reasonable value of the services performed, or for other similar reasons the percentage of the contributions raised which will remain available for application to the specific purposes declared in the application as the object of the solicitation is unreasonably small and the commission so finds.

L.A.C.C. § 7.24.090.

After issuing an information card, the County may recall or revoke it:

> In addition to any ground specified in Division 1 of this title, upon receipt of additional information which, in the opinion of the commission, renders incorrect any statement set forth in any information card, the commission may revoke its approval of any

information card approved by it, and may recall any information card issued by it. L.A.C.C. § 7.24.130. Upon recall of an information card, "the commission may amend or correct such information card or issue in lieu thereof a new information card amended or corrected in accordance with the additional information received." L.A.C.C. § 7.24.150. Section 7.24.260 provides for return of the information card at the request of the Commission upon completion of the solicitation or expiration of the card.

Section 7.24.180 exempts from the statute "solicitations made solely for evangelical, missionary or religious purposes." L.A.C.C. § 7.24.180. Section 7.24.350 allows the Commission to investigate solicitations claiming these purposes.

Any person violating any provision of the County ordinance is guilty of a misdemeanor punishable by a fine not exceeding $1,000 or by imprisonment for a period not exceeding six months, or by both such fine and imprisonment. L.A.C.C. § 7.04.320. "Each such person is guilty of a separate offense for every day during any portion of which any violation of any of the provisions of [the statute] is committed, continued or permitted by such person." *Id.; see also* L.A.C.C. §§ 7.04.300, 7.04.330–7.04.380 (imposing additional criminal and civil penalties for violations of County licensing provisions).

### III. ANALYSIS

#### A. Legal Standard.

 The facial invalidity of the City and County ordinances is a question of law properly determined by the Court. *See Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834–35, 63 L.Ed.2d 73 (1980). Accordingly, the Court may rule on the merits of Plaintiffs' facial challenge to the constitutionality of the City and County ordinances pursuant to Fed.R.Civ.P. 56. *Schaumburg,* 444 U.S. at 634–35, 100 S.Ct. at 834–36; *Holy Spirit Ass'n for the Unification of World Christianity v. Hodge,* 582 F.Supp. 592, 595 (N.D.Tex. 1984).

---

**10.** Title 7, Division 1 of the L.A.C.C. sets forth the General Licensing Procedures for the County of Los Angeles. Chapter 7.08 governs the conditions upon which business licenses may be denied or revoked.

■ "[I]n the area of free expression, a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988). However, "[a] narrowly drawn ordinance, that does not vest in [governmental] officials the undefined power to determine what messages residents will hear may serve [the government's] important interests without running afoul of the First Amendment." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 617, 96 S.Ct. 1755, 1759, 48 L.Ed.2d 243 (1976).

Our First Amendment jurisprudence has long found charitable solicitations "so intertwined with speech that they are entitled to the protections of the First Amendment." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 959, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984). "Prior authorities ... clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Schaumburg*, 444 U.S. at 632, 100 S.Ct. at 833–34 (citing, *e.g.*, *Hynes*, 425 U.S. at 620, 96 S.Ct. at 1760). Because charitable solicitations involve more than "providing information about the characteristics and costs of goods and services," the Supreme Court's decisions have not dealt with them as "purely commercial speech." *Schaumburg*, 444 U.S. at 632, 100 S.Ct. at 834; *Riley v. National Fed'n of the Blind*, 487 U.S. 781, 789, 108 S.Ct. 2667, 2673–74, 101 L.Ed.2d 669 (1988).

■ At the same time, "[s]oliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Schaumburg*, 444 U.S. at 632, 100 S.Ct. at 833–34. The Supreme Court has recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating solicitations. "Without doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940).

■ Therefore, "[t]he issue is whether the [legislative body] has exercised its power to regulate solicitation in such a manner as not unduly to intrude upon the rights of free speech." *Schaumburg*, 444 U.S. at 633, 100 S.Ct. at 834; *Hynes*, 425 U.S. at 616, 96 S.Ct. at 1758–59. When a particular law imposes a "direct restriction" on protected First Amendment activity, the statute "cannot be sustained unless it serves a sufficiently strong, subordinating interest that the [governmental agency] is entitled to protect." *Schaumburg*, 444 U.S. at 636, 100 S.Ct. at 835. Once that legitimate interest is identified, however, to survive a First Amendment challenge, the ordinance must be narrowly tailored to serve the state's legitimate interests "without unnecessarily interfering with First Amendment freedoms." *Id.* at 637, 100 S.Ct. at 836; *see also Riley*, 487 U.S. at 789, 108 S.Ct. at 2673–74; *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. at 961, 104 S.Ct. at 2849.[11]

## B. Plaintiffs Are Entitled To Partial Summary Judgment As To Their First and Second Causes of Action.

■ Plaintiffs argue that the City and County ordinances are unconstitutional be-

---

**11.** The County defendants urge that when considering a facial challenge to a particular statute, "all presumptions and intendments are in favor of the constitutionality of the enactment." County Brief at 5–6 (citing, *e.g.*, *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). The cases the County defendants cite, however, deal with statutes regulating economic activity and, as such, are inapplicable in the First Amendment context. Nevertheless, the Court recognizes that, in any context, the Court is obligated to adopt a construction of a challenged statute consistent with constitutionality, where it is possible to do so. *International Soc'y for Krishna Consciousness of Houston, Inc. v. City of*

cause they grant City and County officials "unbridled discretion" to deny them their First Amendment rights; that they fail to provide adequate procedural safeguards; and that they violate the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb·et seq.[12] Relying heavily on *International Soc'y for Krishna Consciousness of Houston, Inc. v. City of Houston*, 689 F.2d 541 (5th Cir. Unit A 1982), the City and County defendants maintain that the challenged ordinances are constitutional because they vest no discretion in any licensing official.

For the reasons set forth below, the Court concludes that certain provisions of the City and County ordinances constitute direct restraints on protected First Amendment activity. Although the City and County have substantial and legitimate interests in preventing fraud and harassment in the solicitation of funds, the challenged statutory provisions are not narrowly tailored to achieve those objectives. Accordingly, portions of the City and County ordinances are unconstitutional on their face. Plaintiffs thus are entitled to partial summary judgment as to their first and second claims for relief.

### 1. The *City of Houston* Decision.

The City and County defendants argue that in *City of Houston* the Fifth Circuit rejected a facial attack on an ordinance "strikingly" similar to the ordinances here at issue. County Brief at 12; City Brief at 3.

In *City of Houston*, the challenged ordinance ("the Houston ordinance") required persons desiring to solicit funds for charitable purposes to comply with certain registration, identification, and financial disclosure requirements. A registration statement containing "extremely detailed information" was required to be filed with the tax assessor-collector of Houston. The tax assessor-collector was required within ten days of filing to approve the application or explain why the statement did not provide the requisite information. Upon approval of the application, the tax assessor-collector issued the applicant a certificate of registration and a solicitor's identification card. All solicitors were required to visibly display the identification cards. *City of Houston*, 689 F.2d at 544. The Fifth Circuit held this regulatory framework constitutional because it did not vest any discretion in the tax assessor-collector. *Id.* at 546.

Recent amendments to the Houston ordinance had radically simplified its statutory scheme and removed certain provisions which would have rendered it unconstitutional under *Schaumburg*.[13] *City of Houston*, 689 F.2d at 547. The Fifth Circuit noted that the recent amendments (1) deleted language authorizing the tax assessor-collector " 'to make such investigation as he may deem necessary to ascertain the truth' "; (2) withdrew the tax assessor-collector's authority "to refuse to issue a license where any statement in the application is 'false, fraudulent, or untrue' "; and (3) "eliminated the provision authorizing the issuing authority to examine the application, ascertain the truth of the information set forth, and disqualify an applicant when more than 25 percent of the funds to be collected is used for salaries, expenses, and costs of solicitation and collection." *City of Houston*, 689 F.2d at 546–47 (quoting language deleted by the amendment). Of significance to the court was that:

> The repealed provision is exactly the regulation which the Supreme Court found to be unconstitutional in *Schaumburg*. The

---

*Houston*, 689 F.2d 541, 547 (5th Cir. Unit A 1982).

**12.** Plaintiffs have standing to bring a facial challenge to the City and County ordinances. "In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965); *see Schaumburg*, 444 U.S. at 634, 100 S.Ct. at 834–35.

**13.** These amendments were enacted by the City of Houston in response to the filing of the operative complaint and were designed to correct the alleged constitutional infirmities. Specifically, the City "substitute[d] a 'certificate of registration' for a license and ... [made] its issuance mandatory." *Id.* at 543. The trial court nevertheless had struck down the statute because it concluded that the tax assessor-collector was necessarily required to exercise some discretion when reviewing the application and the ordinance lacked the requisite procedural safeguards for the exercise of that discretion. *Id.* at 545.

obvious purpose of the amendment was to remove any language that might be construed as giving discretionary authority, that is censorship authority, a prior restraint in "granting or refusing a license" that can be saved from infirmity only by adequate procedural safeguards. *Id.* at 547.

Thus the defendants' reliance on *City of Houston* is misplaced. The City and County ordinances differ from the Houston ordinance in several material respects. Most significantly, unlike the Houston ordinance, the City and County ordinances do not provide City and County officials with "purely ministerial" powers, but rather improperly authorize the discretionary denial of rights protected by the First Amendment.[14]

## 2. The City Ordinance Directly Restrains Protected First Amendment Activity and Is Not Narrowly Tailored To Prevent Fraud.

### a. The City Ordinance Is Impermissibly Vague and Grants City Officials Overly Broad Discretion To Restrain Protected First Amendment Activity.

The City defendants contend that the City ordinance is necessary to prevent fraudulent charitable solicitations, and that the ordinance should be upheld for "precisely the same reasons" as those relied upon by the court in *City of Houston.* City Brief at 4; City Reply at 1, 2. They claim that "if the solicitor provides the required identifying information, he or she will be issued the Information Card." City Brief at 5. With respect to the regulation of professional fund-raisers, the City defendants acknowledge that the City ordinance's requirements are "more extensive," but conclude that they "do not allow the Department to make a value judgment as to the content of the protected speech." City Brief at 5.

The City defendants' arguments do not withstand scrutiny. Portions of the City ordinance are unconstitutional because they are so vague that persons "of common intelligence must necessarily guess at [their] meaning and differ as to [their] application," *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), and are overbroad in that they "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325

14. The City and County defendants also rely on the California Supreme Court's decision in *Gospel Army v. City of Los Angeles,* 27 Cal.2d 232, 163 P.2d 704 (1945), *appeal dismissed,* 331 U.S. 543 (1947), to support their argument that ordinances "strikingly similar" to the City and County ordinances have been upheld. The *Gospel Army* decision, however, predated significant United States Supreme Court decisions in this area, *see, e.g., Riley v. National Fed'n of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). And, in any event, it is not binding upon this Court.

In addition, the United States Supreme Court cast grave doubts on the constitutionality of the statutory provisions at issue in and the correctness of the *Gospel Army* decision after dismissing the appeal of that decision on jurisdictional grounds. *Rescue Army v. Municipal Ct.,* 331 U.S. 549, 580–84, 67 S.Ct. 1409, 1425–27, 91 L.Ed. 1666 (1947). In dicta, the *Rescue Army* Court specifically noted that the *Gospel Army* decision, regarding portions of the statute substantially identical to those at issue here, relied on a construction that was "to say the least, ambiguous." *Rescue Army,* 331 U.S. at 581, 67 S.Ct. at 1425. While declining to actually express an opinion on the constitutionality of the City ordinance at issue in *Gospel Army,* the Court clearly considered one of the possible interpretations of that decision to be of questionable validity:

> There is, of course, a very substantial difference between the two possible views of the court's construction of the ordinances, for constitutional as well as other purposes.... Obviously, it would be one thing to sustain the licensing provisions if they are to be taken as of the 'automatic mere identification' type, and quite another if they involve the very considerable degree of discretion upon the part of administrative officials which the clearly applicable provisions of the ordinance seem to require by their terms and indeed by the state court's ruling.

*Rescue Army,* 331 U.S. at 582–83, 67 S.Ct. at 1426–27. *See also* Justice Rothman's concurring opinion in *Perlman v. Municipal Court,* 99 Cal. App.3d 568, 581–83, 160 Cal.Rptr. 567 (1979) (noting that although *Gospel Army* has never been questioned or overruled, its analysis would not stand scrutiny under recent Supreme Court precedent).

(1964). Also, several provisions in the licensing scheme embodied in the City ordinance improperly place "unbridled discretion" in the hands of City officials, constituting a prior restraint on protected speech lacking procedural safeguards to guard against potential censorship. *See City of Lakewood,* 486 U.S. at 757, 108 S.Ct. at 2144. In addition, the exemption for solicitation for religious purposes and certain related provisions violate the Establishment Clause.

### (1) L.A.M.C. § 44.04. Notice of Intention.

██ Under Section 44.04, before soliciting charitable contributions, every person must file a Notice of Intention with the Department. The Notice of Intention shall include, "but not be limited to," certain specified information. The additional information the Department may require in its discretion, under section 44.02(d), is left unspecified. This section is thus void on its face for vagueness, and also impermissibly vests unbridled discretion in the licensing authority.

██ The Supreme Court has made clear that "in the First Amendment area 'government may regulate ... only with narrow specificity.'" *Hynes,* 425 U.S. at 620, 96 S.Ct. at 1760 (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)). "The general test of vagueness applies with particular force in review of laws dealing with speech. '[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser.'" *Hynes,* 425 U.S. at 620, 96 S.Ct. at 1760 (quoting *Smith v. California,* 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959)). Thus, this provision must fall because individuals desiring to solicit charitable funds "'must necessarily guess at its meaning.'" *Hynes,* 425 U.S. at 620, 96 S.Ct. at 1760 (quoting *Connally,* 269 U.S. at 391, 46 S.Ct. at 127). From reading the statute, it is impossible to discern with precision what information must be provided when filing a Notice of Intention with the Department. This vagueness renders section 44.04 facially invalid. Moreover, when read in conjunction with section 44.02(d), as it must be, it is plain that the licensing authority has unbridled discretion to determine "the specific information" that will be required to issue the Information Card necessary for soliciting charitable contributions under section 44.09.

██ Furthermore, certain of the specific disclosure requirements set forth in section 44.04 unduly burden the exercise of protected First Amendment rights without serving the City's stated purpose of preventing fraud. Although the government may legitimately require persons to register, identify their solicitors, and make disclosures concerning their solicitation of public funds, unduly burdensome disclosure requirements may run afoul of the First Amendment. *See City of Houston,* 689 F.2d at 550–51; *see also Holy Spirit Ass'n,* 582 F.Supp. at 601. In *City of Houston,* the court stated that the disclosure requirements of the Houston ordinance were saved from constitutional invalidity because they did not compel charitable organizations "to decide whether to remain totally private or, by making public solicitations, reveal publicly all aspects of [their] internal operations." *City of Houston,* 689 F.2d at 556.

The disclosure requirements of the City ordinance are considerably broader and more intrusive than those at issue in *City of Houston.* Although most of section 44.04's disclosure requirements directly relate to the planned charitable solicitation, certain provisions paint with a much broader brush. Subsection (f) requires disclosure of a "detailed financial statement" for the most recent year, and subsection (g) demands the name, address, and telephone number of each officer and member of the applicant's board of directors or trustees. L.A.M.C. § 44.04(f), (g). Such disclosures directly expose the applicant's internal operations to public scrutiny and are unrelated to any legitimate governmental interest, including the City's stated interest in preventing fraudulent solicitations. "The potential chilling effect [of these disclosure requirements] on the exercise of [protected] First Amendment rights ... is manifest, together with the invasion of privacy." *Holy Spirit Ass'n,* 582 F.Supp. at 601.

And since it is left to the Department to condition issuance of the Information Card on any additional specific information it requests, L.A.M.C. § 44.02(d), the overbroad intrusion into First Amendment rights is all the more evident.

Thus, sections 44.04(f) and (g) are not narrowly drawn to serve the City's stated interests, and these provisions are unconstitutional on their face.

### (2) L.A.M.C. § 44.05. Solicitation Agreement—Additional Information.

■ This section requires solicitors to file, with each Notice of Intention, a statement of any agreement made with any agent, solicitor, or professional fund-raiser. "Whenever in the judgment of the General Manager of the Department, the Notice of Intention ... does not disclose for the public sufficient information" concerning such agreements, the Department may require that such additional information be provided upon request. L.A.M.C. § 44.05. The term "sufficient information" is vague and undefined. Thus, this provision again vests unbridled discretion in the hands of the licensing authority, provides no guidelines for the exercise of the General Manager's "judgment" that sufficient information to warrant issuance of an Information Card has been provided, and does not provide appropriate procedural safeguards. *See Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965). In particular, there are no time limits within which the General Manager must act. *See Fernandes v. Limmer,* 663 F.2d 619, 628 (5th Cir. Unit A Dec. 1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982).

Accordingly, section 44.05 is invalid on its face.

### (3) L.A.M.C. § 44.09. Solicitation—Information Card.

■ Section 44.09 prohibits the solicitation of charitable contributions without first obtaining an Information Card. L.A.M.C. § 44.09(a). This provision does not violate the First Amendment on its face. *See Cantwell,* 310 U.S. at 306, 60 S.Ct. at 904 (government may require solicitor to establish his identity and his authority to act for the cause which he purports); *Riley,* 487 U.S. at 799 n. 11, 108 S.Ct. at 2678 n. 11 (narrowly tailored requirement that fund-raiser disclose unambiguously his or her professional status would withstand First Amendment scrutiny). Constitutional problems arise only upon reference to the other requirements set forth in the City ordinance.

### (4) L.A.M.C. § 44.02. Powers of the Department.

L.A.M.C. section 44.02 grants to the Department certain specified powers to regulate the solicitation of charitable contributions. Plaintiffs object to subsections (a) through (d), (e)(4), and (g) of this section.

### (a) Subsections (a) through (c).

■ Subsections (a), (b), and (c) grant the Department broad investigative powers over financial statements filed with the City. Specifically, the Department is empowered to investigate statements on the Notice of Intention and the Report of Results of Activity, to have access to and inspect the books and records relating to any charitable solicitation of the persons by whom or on whose behalf such solicitation is made, and to investigate the method of making or conducting any such solicitation. L.A.M.C. § 44.02.

Significantly, subsections (a) through (c) require the disclosure and availability of information relating solely to the charitable solicitation for which the Information Card is sought. The Supreme Court has recognized that "[e]fforts to promote disclosure of the finances of charitable organizations ... may assist in preventing fraud by informing the public of the ways in which their contributions will be employed." *Schaumburg,* 444 U.S. at 637–38, 100 S.Ct. at 836–37. These subsections simply allow City officials to investigate the accuracy of the submitted information and to require potential solicitors making a specific charitable solicitation to make such information available for inspection. They are thus a narrowly tailored mechanism for serving the City's legitimate interests which does not unduly restrict First Amendment rights. As such, they are akin

to the informational requirements that the Fifth Circuit upheld in *City of Houston*, 689 F.2d at 546. Therefore, subsections (a) through (c) are facially constitutional. *See Holy Spirit Ass'n*, 582 F.Supp. at 602.

**(b) Subsection (d).**

Pursuant to subsection (d), the Department is empowered to:

> issue an Information Card no later than fifteen (15) days after receipt of a Notice of Intention; provided that where such notice is incomplete or otherwise fails to meet the requirements of Section 44.04 of this Article, the Department shall within ten (10) days after receipt of the notice notify the applicant in writing of the specific information needed to meet the requirements of Section 44.04.

L.A.M.C. § 44.02(d).

As already discussed, section 44.04 is facially invalid because it does not adequately specify the information that must be included in the Notice of Intention, and because it allows City officials to exercise unbridled discretion as to what information must be provided before an Information Card will issue. Because section 44.02(d) depends upon compliance with section 44.04, it, too, is invalid on its face.

Even if section 44.04's deficiencies were remedied, however, section 44.02(d) would not withstand constitutional attack. Although this subsection requires City officials to notify applicants of the specific information necessary to meet the requirements of section 44.04, it does not require City officials to issue an Information Card upon receipt of such additional information. Thus, section 44.02(d) apparently allows the City to indefinitely restrain protected First Amendment activity upon an initial determination that the Notice of Intention is incomplete. *See Fernandes*, 663 F.2d at 628.

**(c) Subsection (e)(4).**

Pursuant to subsection (e)(4), the Department is empowered to issue Information Cards which shall indicate, *inter alia*, "[a]ny additional information which in the opinion of the Department will be of assistance to the public in determining the nature and worthiness of the solicitation." L.A.M.C. § 44.02(e)(4). Again, this provision improperly places matters relating to the issuance of Information Cards in the sole and unfettered discretion of City officials. The ordinance is silent as to any procedural guidelines for the Department's requirement of additional information.

Even more inimical to the First Amendment freedoms at stake here is that when subsection (e)(4) is read with section 44.09, it is apparent that the City is engaged in the impermissible regulation of speech content. The two provisions mandate the inclusion on the Information Cards of City-selected speech that the Department views as "of assistance to the public in determining the nature and worthiness of the solicitation." Under section 44.09, charitable solicitors must exhibit the Information Card issued by the City to persons solicited before accepting any contributions. In a similar context, the Supreme Court has held that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795, 108 S.Ct. at 2677. In the context of charitable solicitations, such content-based regulation is subject to exacting First Amendment scrutiny. *Id.* at 798, 108 S.Ct. at 2678.

Presumably, the City's objective is to prevent fraudulent solicitations by compelling solicitors to convey the City defendants' opinion as to the "nature and worthiness" of the solicitation. Although this stated interest is undoubtedly substantial, the means chosen to accomplish it are insufficiently tailored to meet that interest and are thus unduly burdensome upon the exercise of First Amendment rights. *Riley*, 487 U.S. at 798, 108 S.Ct. at 2678. This provision plainly permits the Department to require disclosure of its own views concerning the "nature and worthiness" of the solicitation, even if it is not explicitly stated as such. Where the City's opinion of a particular cause is unfavorable, "the compelled disclosure will almost certainly hamper the legitimate efforts" of solicitors to obtain charitable contributions. *Riley*, 487 U.S. at 799, 108 S.Ct. at 2679. "In contrast to the prophylactic, imprecise, and unduly

burdensome rule the [City] has adopted" to prevent fraudulent solicitations, "more benign and narrowly tailored options are available. For example, ... the [City] may itself publish the detailed financial disclosure forms" required to be filed, or, alternatively, the City could "vigorously enforce its antifraud laws" to achieve its stated purpose. *Id.* at 800, 108 S.Ct. at 2679. "These more narrowly tailored rules are in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored." *Id.*

Subsection (e)(4) therefore fails constitutional scrutiny and is facially invalid.

### (d) Subsection (g).

▮ Subsection (g) empowers the Department to recall and declare void an Information Card "upon receipt of additional information by the Department which renders incorrect any statement set forth on the Information Card." L.A.M.C. § 44.02(g). Upon such recall or revocation, "[t]he Department may amend or correct such statement and issue a new Information Card." L.A.M:C. § 44.02(g).

Because gaining relevant information as to the applicant is proper, the falsification of such information is not constitutionally privileged. *Fernandes,* 663 F.2d at 629. However, subsection (g) allows revocation for innocent mistakes as well as fraudulent representations. Moreover, the Information Card is created and issued by the Department, not the applicant. On its face, subsection (g) would allow revocation based on errors made by the Department, rather than the applicant. Subsection (g) also leaves the decisions whether to amend or correct a recalled Information Card and whether to issue a new Information Card entirely to the City official's unbridled discretion without providing any procedural safeguards. Thus, subsection (g) is facially invalid.

### (5) L.A.M.C. § 44.06. Accounting System.

▮ This provision prohibits persons from soliciting charitable contributions unless a system of accounting is maintained "either on the cash or accrual basis, according to established and customary accounting principles." L.A.M.C. § 44.06. Contrary to Plaintiffs' assertion, this provision does not require that all persons desiring to solicit charitable contributions hire accountants and lawyers. Plaintiffs' Supp.Brief at 13. Rather, this section merely requires that solicitors maintain accurate and detailed books and records according to standard accounting practice. This requirement is reasonably calculated to make the Department's right to review financial records meaningful. *See supra* Part III.B.2.a(4)(a). *Holy Spirit Ass'n,* 582 F.Supp. at 603; *see also Schaumburg,* 444 U.S. at 637–38, 100 S.Ct. at 836–37. Thus, this section is valid.

### (6) L.A.M.C. § 44.14. Professional Fund–Raisers and Solicitors.

▮ The City ordinance provisions regarding professional fund-raisers are constitutionally infirm.[15] Before issuing a professional fund-raiser license, the Department is required to verify that the applicant is of "good character." L.A.M.C. § 44.14(d)(1). This term is undefined and, apparently, a matter to be determined by the Department in its unlimited discretion. The standard is thus "indefinite and does not comport with the constitutional requirement that discretion in public officials be specifically and narrowly circumscribed." *Fernandes,* 663 F.2d at 631.

▮ The provisions require that the applicant demonstrate "sufficient financial resources" to "successfully fulfill" its obligations. L.A.M.C. § 44.14(d)(2). The Department determines whether this amorphous standard has been met and may approve or deny a professional fund-raiser license based upon its discretionary finding. This provision is unconstitutionally vague and impermissibly vests unbridled

---

**15.** "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley,* 487 U.S. at 801, 108 S.Ct. at 2680. Thus, the City's licensing requirements for professional fund-raisers are not immune from First Amendment scrutiny.

discretion in the hands of the licensing authority.

█ Unlike other provisions of the City ordinance, section 44.14 does provide for certain procedural safeguards when the Department has determined that the vague standards of subsections (d)(1) and (2) are not met or concludes that the license shall be denied on the basis of failure to meet any of the other conditions set forth in section 44.14. The procedure set forth creates an avenue of appeal to the Board. L.A.M.C. §§ 44.14(f)(1)–(5). The Department must notify the applicant of the denial within fifteen days; the applicant has ten days within which to appeal. *Id.* The Board must schedule a hearing within thirty days of the notice of appeal and notify the applicant of its decision within five days after "completion of the hearing process." *Id.*

This procedure utterly fails to meet the "procedural safeguards designed to obviate the dangers of a censorship system" set forth in *Freedman,* 380 U.S. at 58, 85 S.Ct. at 738–39. *See Holy Spirit Ass'n,* 582 F.Supp. at 597. First, the ordinance does not expressly state who bears the burden of proof, and by requiring the applicant to appeal, it implicitly places the burden of going forward on the applicant. "[T]he burden of proving ... unprotected expression must rest on the censor." *Freedman,* 380 U.S. at 58, 85 S.Ct. at 738–39. Second, there is no provision for a judicial proceeding even though the Board's notification of denial would constitute a final restraint. *Id.* However, the burden must be on the *censor* to "within a specified brief period, either issue a license or go to court to restrain" the speech. *Id.* at 58–59, 85 S.Ct. at 738–39. Finally, "the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.* at 59, 85 S.Ct. at 739. The City ordinance plainly does not provide for a "prompt final judicial decision." [16] *See Fernandes,* 663 F.2d at 625 n. 6.

█ Further, the requirements that professional fund-raisers pay a $55 fee and post a $5,000 bond directly restrain protected speech and are not narrowly tailored to meet the substantial interest asserted by the City. L.A.M.C. § 44.14(c), (e). "Freedom of speech ... [must be] available to all, not merely to those who can pay their own way." *Murdock v. Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). The courts have held that a "licensing fee to be used in defraying administrative costs is permissible, but only to the extent that the fees are necessary." *Fernandes,* 663 F.2d at 633 (citations omitted); *see also Holy Spirit Ass'n,* 582 F.Supp. at 604. Sections 44.14(c) and (e) impermissibly impose an exaction on the privilege of engaging in protected First Amendment activity, and the City defendants have not demonstrated a link between the fee and the bond and the costs of the licensing process. Consequently, section 44.14 is unconstitutional on its face.

### (7) L.A.M.C. § 44.12. Additional Provisions.

█ The City ordinance exempts certain solicitations, including solicitations made "solely for evangelical, missionary or religious purposes." L.A.M.C. § 44.12. However, where any solicitation is made for evangelical, missionary, or religious purposes, but "in a manner which, in the opinion of the Department, is calculated to give, or may give, the impression ... that the purpose of such solicitation is either in whole or in part charitable," the Department is authorized to investigate the matter and publicize its findings "as it deems best to advise the public of the facts of the case." *Id.* Plaintiffs assert that this provision violates the Establishment Clause of the First Amendment to the United States Constitution.

16. The application and appeals procedures set forth in the ordinance also fail to meet the "prompt" requirement. They would require the applicant to refrain from what may be constitutionally protected speech while pursuing the Board appeals process, which, at a minimum, could take fifty days. *Freedman,* 380 U.S. at 59, 85 S.Ct. at 739; *see also Teitel Film Corp. v.*

*Cusack,* 390 U.S. 139, 141, 88 S.Ct. 754, 755–56, 19 L.Ed.2d 966 (1968) (per curiam) (holding that a period of 50 to 57 days to complete an administrative permit process did not meet the constitutional standard requiring that the official either license, or go to court to restrain, film exhibition within a specified brief period).

"[T]he Establishment Clause was intended to afford protection [against] sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). The Court has developed three criteria for determining whether a statute survives an Establishment Clause challenge:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; ... finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111 (citations omitted). The City ordinance fails each of these tests.[17]

First, the City defendants have failed to articulate a secular legislative purpose that would justify its preference for solicitations solely for evangelical, missionary, or religious purposes.[18] Second, by exclusively exempting solicitations for religious purposes, the ordinance impermissibly advances religion.[19] As the Supreme Court stated in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 8–9, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989):

It is part of our settled jurisprudence that "the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization." The core notion animating the requirement that a statute possess "a secular legislative purpose" and that "its principal or primary effect ... be one that neither advances nor inhibits religion," is not only that government may not be overtly hostile to religion but also that it may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling nonadherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community.

*Texas Monthly*, 489 U.S. at 8–9, 109 S.Ct. at 896 (citations omitted). Thus, the exemption provides unjustifiable assistance to religious solicitors and "cannot but 'conve[y] a message of endorsement' to the slighted members of the community." *Texas Monthly*, 489 U.S. at 15, 109 S.Ct. at 899.

Third, the ordinance creates excessive entanglement between church and state by requiring the Department to examine and mon-

**17.** This Court rejects Plaintiffs' contention that section 44.12 constitutes a prior restraint on speech. If the Department finds that a particular solicitation is in whole or in part "charitable" its recourse is investigation and publicity—not an act of censorship, but the creation of an avenue by which the City enters its own voice in the marketplace of ideas. Nor does the exemption allow City officials to exercise unbridled discretion in deciding whether a particular solicitation is in whole or in part "charitable." The terms "charitable" and "solicitation" are defined in the City ordinance, and Plaintiffs do not challenge these definitions for vagueness or overbreadth.

**18.** Although the statute purports to exempt solicitations made for three distinct purposes, each of the exempted purposes is in fact a religious one. "Evangelical" is defined as "1. of, relating to, or being in agreement with the Christian gospel esp. as it is presented in the four Gospels 2. Protestant." *Merriam Webster's Collegiate Dictionary* 401 (10th ed.1993). The definition of "missionary" is "a person undertaking a mission and esp. a religious mission." *Id.* at 745. Statutes that confer benefits upon religious organizations have generally withstood constitutional attack only where "the benefits derived by religious organi-

zations flowed to a large number of nonreligious groups as well." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 11, 109 S.Ct. 890, 897, 103 L.Ed.2d 1 (1989); *see also Walz*, 397 U.S. at 673, 90 S.Ct. at 1413–14; *Committee for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 793–94, 93 S.Ct. 2955, 2975–76, 37 L.Ed.2d 948 (1973) (breadth of exemption for religious groups is unquestionably an "important factor" in assessing its constitutionality).

**19.** Of course, government policies with secular objectives may incidentally benefit religion. *Texas Monthly*, 489 U.S. at 10, 109 S.Ct. at 897; *see also Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (state university that makes its facilities available for activities of registered student groups may not deny equal access to such a group desiring to use those facilities for religious worship or discussion); *Walz*, 397 U.S. 664, 90 S.Ct. 1409 (upholding property tax exemption that applied to religious properties no less than to real estate owned by a wide array of nonprofit organizations, despite the sizable tax savings it accorded religious groups).

itor religious solicitations, to determine whether the solicitation "has been, is being or is intended to be" for religious purposes, to review the "manner" of the solicitation to determine the true purpose ("in the opinion of the Department" whether it appears "in whole or part charitable"), and, depending on its findings, take certain action. This government involvement in religious activity is excessive and is a "continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz*, 397 U.S. at 675, 90 S.Ct. at 1414.

Because this provision of the City ordinance "lacks a secular objective that would justify this preference [for religious purposes] along with similar benefits for nonreligious [communications], and because it effectively endorses religious belief," *Texas Monthly*, 489 U.S. at 17, 109 S.Ct. at 901, and because it creates excessive governmental entanglement with religion, it does not withstand constitutional scrutiny.[20]

**b. The City Ordinance Is Not Narrowly Tailored To Serve the City's Substantial Interests In Preventing Fraud.**

■ As discussed, certain portions of the City ordinance impose vague requirements on charitable solicitors, impermissibly burden protected speech, and vest the control of that speech in the hands of licensing officials with unfettered discretion to proscribe it, without providing adequate procedural safeguards. Because these provisions constitute a "direct restriction" on protected First Amendment activity, they cannot be sustained unless they are "intimately related" to the City's substantial governmental interests in preventing fraud and harassment of its citizens.

*Schaumburg*, 444 U.S. at 636, 100 S.Ct. at 835–36.

Although the City's interest in preventing fraud is substantial, the City ordinance is not narrowly tailored to this end. The City's legitimate interests may be better served by measures less intrusive than direct, discretionary prohibitions on charitable solicitation. *Schaumburg*, 444 U.S. at 636, 100 S.Ct. at 835–36. "Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly. Efforts to promote disclosure of the [information relating to particular solicitors] also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed." *Id.* at 637–38, 100 S.Ct. at 836–37 (citations omitted). The ordinance at issue in *City of Houston* is one example of a less intrusive means by which the City might legitimately legislate in this area. *City of Houston*, 689 F.2d at 558–62. Although such measures may not be the most efficient means of preventing fraud, the Supreme Court has emphatically reaffirmed that "the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley*, 487 U.S. at 795, 108 S.Ct. at 2677. Therefore, certain provisions of the City Ordinance do not withstand constitutional scrutiny.

**3. The County Ordinance Directly Restrains Protected First Amendment Activity and Is Not Narrowly Tailored To Prevent Fraud.**

**a. Certain Provisions of The County Ordinance Grant County Officials Broad Discretion To Restrain Protected First Amendment Activity.**

Like the City defendants, the County defendants assert that the County ordinance is

---

20. The Court notes that the First Amendment does not necessarily preclude the City from investigating charitable solicitations and publishing the results of its investigation. The City's interest in preventing fraudulent solicitations is substantial, and publication of the results of the City's investigation would, ordinarily, constitute a benign and narrowly tailored means of achieving this end. *See Riley*, 487 U.S. at 800, 108 S.Ct. at 2679–80 (as a general rule, state may publish detailed financial disclosure forms to inform public about charitable solicitations); *cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83

S.Ct. 631, 9 L.Ed.2d 584 (1963) (invalidating state commission's practice of notifying book distributors that certain designated books or magazines had been determined to be objectionable for sale to youths, thanking distributors in advance for their "cooperation," and reminding distributors of commission's duty to recommend prosecution of purveyors of obscenity). With respect to section 44.12, however, the invalidity of the exemption for religious solicitations renders the investigation and publication provisions likewise deficient.

"vital to protect the citizens of Los Angeles from unscrupulous organizations and fraudulent schemes." County Brief at 6. According to the County defendants, the County ordinance merely requires that applicants submit sufficient information to "allow the public to make an informed decision on whether or not to donate to the solicitor's cause," and does not unduly intrude upon the rights of free speech. County Brief at 10.

The Court disagrees. As noted, charitable solicitations "involve a variety of speech interests" that are within the protection of the First Amendment, and therefore have not been dealt with as "purely commercial speech." *Schaumburg*, 444 U.S. at 632, 100 S.Ct. at 834. Notwithstanding this distinction, certain portions of the County ordinance require all persons wishing to solicit charitable donations to obtain a business license and impose restrictions upon the granting of such a license identical to those applied in commercial contexts.

### (1) L.A.C.C. § 7.24.030. Required.

■ Under this section, a person may not solicit charitable contributions unless such person first either obtains from the business license commission an information card, or possesses a city information card approved by the commission. L.A.C.C. § 7.24.030. Although Plaintiffs argue that this provision is unconstitutional, their position is without support. It is well established that when a person undertakes the collection of funds, a reasonable registration or identification requirement may be imposed. *Thomas v. Collins*, 323 U.S. 516, 540, 65 S.Ct. 315, 327, 89 L.Ed. 430 (1945); *see also Cantwell*, 310 U.S. at 306, 60 S.Ct. at 904. This requirement is valid on its face.

### (2) L.A.C.C. § 7.24.040. Application—Contents and Filing.

■ Under this section, every person desiring an information card must file an application with the business license commission setting forth certain specified information. As discussed *supra* at Part III.B.2.a.(4).(a), disclosure requirements that specifically relate to the planned charitable solicitation are constitutional. *See City of Houston*, 689 F.2d at 556. However, disclosure requirements that have no bearing on the charitable solicitation impermissibly chill and intrude upon protected First Amendment rights. *See Holy Spirit Ass'n*, 582 F.Supp. at 601–2.

The requirement that applicants file a "specific statement of all contributions collected or received" within the calendar year preceding the date of such filing, including the "expenditures or use made of such contributions, together with the names and addresses of all persons or associations receiving ... compensation ... from such contributions and the respective amounts thereof," is facially invalid. L.A.C.C. § 7.24.040.F. This requirement is unduly burdensome, unnecessarily compels applicants to disclose their internal operations, and fails to materially advance the County's substantial and legitimate interest in preventing fraudulent solicitations. *See Holy Spirit Ass'n*, 582 F.Supp. at 601–02.

Further, the requirements that the applicant disclose the names and addresses of its officers and directors and submit a copy of the applicant's resolution authorizing such solicitation are facially invalid. L.A.C.C. § 7.24.040.G., H. These requirements similarly chill the exercise of free speech rights by compelling publication of the applicant's private and internal operations and are not intimately related to the County's legitimate interest in preventing fraud. *See Holy Spirit Ass'n*, 582 F.Supp. at 601.

Accordingly, the Court concludes that subsections F, G, and H of section 7.24.040 are facially invalid.

### (3) L.A.C.C. § 7.24.070. Application—Additional Information Required When.

■ This section provides that whenever, "in the opinion of the commission, the application does not disclose sufficient information for the public concerning the facts hereinabove required," then, "upon the request of the commission therefor, the applicant shall file, in writing, ... such additional information as the commission may specifically require upon the foregoing subjects." L.A.C.C. § 7.24.070. The term "sufficient

information" is vague, and the determination whether this standard has been met is left to the commission's unfettered discretion. Therefore, section 7.24.070 is facially invalid.

### (4) L.A.C.C. § 7.24.080. Application—Action By Commission.

■ This section provides that upon receipt of an application, "the business license commission may grant, deny or revoke a county information card, and may approve, disapprove or withdraw its approval of a city information card upon the same grounds and pursuant to the same procedures" as those applicable to other business licenses. L.A.C.C. § 7.24.080. Pursuant to L.A.C.C. §§ 7.08.10–7.08.280, business licenses may be denied or revoked for any number of reasons. For instance, L.A.C.C. § 7.08.080 provides that a license may be denied if the applicant "is unfit to be trusted with the privileges granted by such license, or has a bad moral character, intemperate habits, or a bad reputation for truth, honesty or integrity." L.A.C.C. § 7.08.080.C.[21] This provision is blatantly unconstitutional in that it leaves the denial of protected First Amendment rights to the unbridled discretion of the commission and allows County officials to restrain speech based on their value judgment about the speakers' character. As such, section 7.24.080 creates the potential for censorship and is facially invalid.

### (5) L.A.C.C. § 7.24.120. Contents.

■ This section provides that the "information card also shall set forth so much of the pertinent facts stated in the application or disclosed by any additional information obtained by the commission as the commission finds will be of assistance to any person solicited for any contribution to enable such person to determine the nature and worthiness of the purpose for which such solicitation is made." L.A.C.C. § 7.24.120.

This provision is invalid for the same reasons as those portions of the City ordinance compelling solicitors to convey the opinion of governmental officials to persons solicited. *See* discussion *supra* at Part III.B.2.a.(4).c. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," and, in the context of charitable solicitations, such compelled statements of opinion are unduly burdensome and not narrowly tailored to serve the government's legitimate interests. *Riley,* 487 U.S. at 795.

Therefore, like L.A.M.C. § 44.02(e)(4), this section is facially invalid.

### (6) L.A.C.C. § 7.24.090. Denial of Approval—Grounds.

■ This section provides that the business license commission may deny or revoke a county information card, or may refuse to approve a city information card, if it finds that the percentage of the contributions raised which will remain available for the specific purposes stated in the application is "unreasonably small" because of "inefficient operation, the payment of one or more salaries in amounts substantially greater than the reasonable value of the services performed, or for other similar reasons." L.A.C.C. § 7.24.090.

This section impermissibly conditions the exercise of First Amendment rights on business efficiency, improperly allows the commission to arbitrarily determine the "reasonable value" of services, and fails to adequately define "other similar reasons." Although this provision does not include a "fixed percentage limitation" on the costs of solicitation, it nonetheless imposes a cost-effectiveness requirement on all types of charitable organizations. "The realm of religious and charitable organizations ... includes groups whose unorthodox messages will inevitably yield less cost-effective solicitation results." *Fernandes,* 663 F.2d at 631 (citing *Schaumburg,* 444 U.S. at 635–37, 100 S.Ct. at 835–36). This provision also subjects charitable organizations to a complete

---

**21.** Although section 7.08.080 purportedly applies only to "Activities Not Involving Free Speech," it expressly excludes certain activities from its application but does not exclude the provisions relating to charitable solicitations. Under the familiar judicial maxim, *expressio unius est exclusio alterius,* the Court cannot, as the County defendants urge, read into the statute an exclusion for charitable solicitations when such exclusion was omitted by the legislative body.

financial audit. Such burdens on the free exercise of First Amendment rights cannot be justified. *Fernandes,* 663 F.2d at 631.

Therefore, this section is also invalid on its face.

### (7) L.A.C.C. §§ 7.24.130 through 7.24.150.

■ Under these provisions, the business license commission is authorized to recall or revoke information cards upon receipt of information which, "in the opinion of the commission," renders any statement in the information card incorrect. L.A.C.C. § 7.24.130. Upon notification, the holder of the information card must return the card within 48 hours. L.A.C.C. § 7.24.140. After recall, the commission "may amend or correct such information card or issue in lieu thereof a new information card" in accordance with the additional information received. L.A.C.C. § 7.24.150.

These sections are similar to L.A.M.C. § 44.02(g). *See* discussion *supra* Part III. B.2.a.(4)(d). As with that provision, section 7.24.130 is invalid because it allows County officials to deny the right to engage in protected speech based upon an innocent mistake, or based upon an error made by the County itself. Further, section 7.24.140 requires that the information card be returned without allowing the holder an opportunity to be heard, while section 7.24.150 allows the commission to amend or correct the information card but provides no time limits for the reissuance. *See Freedman,* 380 U.S. at 59, 85 S.Ct. at 739.

Thus, these provisions are facially invalid.

### (8) L.A.C.C. § 724.260. Return of Information Card.

■ This section requires that upon request by the commission, the holder of an information card shall return such information card "upon completion of the solicitation for which it was issued, or at the expiration of the period for which it is valid, whichever first occurs." L.A.C.C. § 7.24.260. This provision arbitrarily terminates solicitors' First Amendment rights upon expiration of a specified period, irrespective of whether they are continuing to engage in protected activity. Information card holders are given no

opportunity to obtain an extension or to establish good cause to continue their solicitations. The absence of procedural safeguards renders this provision facially invalid. *See Freedman,* 380 U.S. at 59, 85 S.Ct. at 739.

### (9) L.A.C.C. § 7.24.180. Exceptions To Chapter Applicability.

■ This section provides that the County ordinance does not apply to certain solicitations, including solicitations made "solely for evangelical, missionary or religious purposes." L.A.C.C. § 7.24.180. The County defendants have not articulated any secular purpose for this exemption. Thus, like L.A.M.C. § 44.12, this section provides unjustifiable assistance to religious solicitors and "cannot but 'conve[y] a message of endorsement' to slighted members of the community." *Texas Monthly,* 489 U.S. at 15, 109 S.Ct. at 899 (citations omitted). *See* discussion *supra* Part III.B.2.a.(7). Because the exemption lacks a secular objective and because it effectively endorses religious activity, it fails constitutional scrutiny. *Texas Monthly,* 489 U.S. at 17, 109 S.Ct. at 901.

### (10) L.A.C.C. § 7.24.350. Investigation— Solicitations for Evangelical, Missionary or Religious Purposes.

Under this section, where the commission discovers that any solicitation is made for evangelical, missionary, or religious purposes, "but in such manner as in the opinion of the commission is calculated to give or may give the impression" that its purpose is either in whole or in part charitable, then the commission, "if in its opinion the public interest will be subserved thereby," shall investigate the matter and publicize its findings. L.A.C.C. § 7.24.350. This section adds the evils of excessive governmental entanglement with religious activity to the exemption for charitable solicitations for religious purposes. Together, they render the County ordinance in violation of the Establishment Clause. *See* discussion *supra* Part III.B.2.a.(7).

### b. The County Ordinance Is Not Narrowly Tailored To Serve the County's Substantial Interests in Preventing Fraud.

■ Applying well-established First Amendment principles, the Court finds that

the County ordinance is not narrowly tailored to achieve the County's principal asserted interest: the prevention of fraud. As with the City, the County may prevent fraudulent solicitations through any number of less restrictive alternatives. For example, the County is free to enforce its already existing fraud laws and to require charities to file financial disclosure reports. *See Schaumburg,* 444 U.S. at 637–38, 100 S.Ct. at 836–37.

### c. The Procedural Safeguards Contained in the County Ordinance Do Not Remedy Its Deficiencies.

■ The County defendants assert that even if the County ordinance restrains free speech, it should be found valid because of its numerous procedural safeguards. County Brief at 14. The County defendants point to provisions of the County ordinance that allow applicants to conduct solicitations pending review of their applications, and further allow applicants to appeal any adverse decisions. County Brief at 14.

■ This argument is not persuasive for two reasons. First, the opportunity to appeal the denial of a solicitation license does not remedy the deficiencies discussed above. Under the County ordinance, County officials may exercise their discretion to restrain constitutionally protected activity. This imprecise and unduly burdensome discretionary standard renders certain provisions of the County ordinance invalid. On appeal before the commission, the applicant would be held to the same unconstitutional standard. "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969).

Second, the procedural safeguards contained in the County ordinance are not sufficient to satisfy First Amendment standards. In *Freedman,* 380 U.S. at 59, 85 S.Ct. at 739, the Supreme Court held that prior restraints upon First Amendment rights avoid constitutional infirmity only where certain procedural requirements are present. As discussed *su-*

*pra* at Part III.B.2.a.(6), these safeguards include the following: 1) "a requirement that the state initiate ... and bear the burden of proof" in a judicial action to restrain the allegedly unprotected speech; 2) "an assurance that [speech] will not be delayed ... while the state seeks protracted judicial review"; and 3) "a requirement that judicial review will be prompt." *Fernandes,* 663 F.2d at 625 n. 6; *see also Freedman,* 380 U.S. at 59–60, 85 S.Ct. at 739–40. Even a cursory review of the County ordinance reveals that it does not provide adequate procedural safeguards under *Freedman.*

Finally, the Court rejects the County defendants' claim that the County ordinance is not a "prior restraint." The County ordinance is plainly a licensing statute for charitable solicitations for which failure to comply subjects one to criminal penalties. The Supreme Court has specifically stated that "a licensing statute placing unbridled discretion in the hands of a government official or agency *constitutes a prior restraint* and may result in censorship." *City of Lakewood,* 486 U.S. at 757, 108 S.Ct. at 2144 (emphasis added); *see also Lovell v. City of Griffin,* 303 U.S. 444, 451, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938). And, as discussed *supra,* the County ordinance contains numerous provisions for revocation that fail to provide adequate procedural safeguards. *See* L.A.C.C. §§ 7.08.10–7.08.280; L.A.C.C. § 7.24.130. The "uncontrolled power of revocation ... is but the converse of [a] system of prior licensing." *Jones v. City of Opelika,* 316 U.S. 584, 615 n. 5, 62 S.Ct. 1231, 1247, 86 L.Ed. 1691 (1942) (Douglas, J., dissenting), *majority opinion vacated,* 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943); *see also Holy Spirit Ass'n,* 582 F.Supp. at 600; *Carlin Communications, Inc. v. Mountain States Telephone and Telegraph Co.,* 827 F.2d 1291, 1296 (9th Cir.1987). Because the County ordinance grants County officials discretion to refuse to issue business licenses to solicitors of charitable contributions and further authorizes the unrestricted right of revocation of such licenses after they issue, it constitutes a prior restraint on protected First Amendment rights.

■ The County urges that the "temporary license" provisions of the ordinance remove it from the category of a prior restraint on speech, against which the heavy presumption of unconstitutionality applies. It is true that pursuant to section 7.06.060, upon receipt of a license fee, the tax collector-assessor must issue a dated receipt which constitutes a temporary license. L.A.C.C. §§ 7.06.050, 7.06.060. The temporary license expires:

> upon the final determination of the application or at the end of 60 days, whichever first occurs, except that if the tax collector finds ... that at the end of 60 days the application has not finally been acted upon through no fault of the applicant and that expiration of the temporary license will cause unnecessary hardship to the applicant inconsistent with the purpose and intent of this title, or that the hardship to the applicant by the denial of an extension would be disproportionate to any benefit to the public, he may extend such temporary license for a period not to exceed 30 days.

L.A.C.C. § 7.06.060. Yet, by their own terms, the temporary license provisions cannot apply to charitable solicitations. First, the County itself contends that applicants desiring to solicit charitable funds are not required to pay a licensing fee. Therefore, they could not obtain a "dated receipt" under section 7.06.050, and would be ineligible for the temporary license.[22] Second, the ordinance provides that licenses for "fund-raising for charitable purposes" are "good for not more than five days." L.A.C.C. § 7.06.160. This is plainly inconsistent with the issuance of a temporary license running for 60 days.

Even if the Court were to find that the temporary licensing provisions apply to charitable solicitations, which it expressly does not, it would still find the challenged provisions of the County ordinance to work an unconstitutional prior restraint on protected speech because they allow County officials to restrain charitable solicitations prior to their dissemination and prior to an adequate determination that the solicitation is fraudulent, and thus outside the protection of the First Amendment.[23] If, for example, an individual applies for an information card more than 60 days prior to the planned solicitation, the temporary license may expire before the date of the solicitation without a final determination having been rendered. Similarly, the County ordinance contains no assurance that a temporary license will not expire while a charitable solicitation is being conducted, thereby restraining appeals for charitable funds occurring after the date of expiration. The temporary license provisions clearly contemplate that solicitations may be restrained by authorizing County officials to extend the temporary license upon a showing of "unnecessary hardship" or "disproportionate" harm. L.A.C.C. § 7.06.060. Yet the statute fails to provide any guidelines for determining whether these conditions exist, and in any event, arbitrarily limits extensions to 30 days. Thus, although the temporary license provisions may postpone the imposition of a prior restraint on charitable solicitations, they do not eliminate the risk of censure.

## IV. CONCLUSION

■ The City and County ordinances contain numerous constitutional failings, as described above, which render them in violation of the First and Fourteenth Amend-

---

**22.** Although the County defendants assert that there is no fee required for charitable solicitors, the County ordinance's fee schedule contains conflicting provisions. The schedule states that there is no fee required for charitable solicitors but imposes a $2 fee on individuals wishing to engage in activities for "Charitable Purposes—not more than five days." L.A.C.C. § 7.14.010. Plaintiffs have not challenged the fee requirements of the County ordinance in this action. Nor have Plaintiffs raised the First Amendment or Equal Protection challenges that might arise from the disparate treatment by the County of protected speech, as to which the County imposes more burdensome restrictions in the form of a

five-day limit on solicitation (if a license issues at all), and unprotected commercial activities.

**23.** The Supreme Court has found that a restraint is "prior" when it may be imposed prior to a communication's dissemination, *see e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975) or prior to "an adequate determination that [the expression] is not protected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973).

ments to the United States Constitution. Accordingly, the Court grants partial summary judgment in favor of Plaintiffs as to their first and second causes of action.[24] The City and County defendants are hereby enjoined from enforcing those provisions of the City and County ordinances that are inconsistent with the First Amendment, as set forth in this Order.

IT IS SO ORDERED.

---

**24.** The Court rejects Plaintiffs' claims arising under the Religious Freedom Restoration Act. As discussed, "[s]oliciting financial support is undoubtedly subject to reasonable regulation." *Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833–34. Plaintiffs have made no showing that enforcement of the City and County ordinances would impose a "substantial burden" on their exercise of religion. *See* 42 U.S.C. § 2000bb–1; *see also Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) ("substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs' " (citations omitted)).