236 F.3d 1124 (9th Cir. 2000)
 JAMES B. TYLER; MARY ANN HARTMAN; JAMES F. DURFEE; EDWARD A. JOHNSON; ANDREW L. SOLOW, Plaintiffs-Appellants,
v.
ANDREW CUOMO, Secretary of HUD; CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation; MISSION HOUSING DEVELOPMENT CORPORATION, a OPINION California Corporation; 1010 SVN ASSOCIATES, a California Limited Partnership; VINCENT MARSH, Secretary, San Francisco Landmarks Preservation Advisory Board, Defendants-Appellees.
 No. 99-16242
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 16, 2000
Filed December 15, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Antonio Rossman, San Francisco, California, and Laurel S. Stanley, Stanley & Rose, Oakland, California, for the plaintiffs-appellants.
 Lisa-Anne M. Wong, Deputy City Attorney, San Francisco, California, for defendant-appellee City and County of San Francisco.
 Sean H. Donahue, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for defendant appellee Andrew Cuomo, Secretary of Housing and Urban Development.
 Stuart C. Plunkett, O'Melveny & Myers LLP, San Francisco, California, for defendants-appellees Mission Housing Development Corporation and 1010 SVN Associates.
 Appeal from the United States District Court for the Northern District of California Vaughn R. Walker, District Judge, Presiding. D.C. No. CV 96-3056 VRW
 Before: Andrew J. Kleinfeld, A. Wallace Tashima, and Marsha S. Berzon, Circuit Judges.
 TASHIMA, Circuit Judge:
 
 
 1
 For the second time, this case is before us for the resolution of justiciability issues. Following remand from this court, the district court dismissed the action for the second time for lack of Article III standing. Plaintiffs, who are homeowners in San Francisco's Mission District ("Homeowners" or "plaintiffs"), again appeal.
 
 
 2
 Homeowners brought this action against defendants, United States Department of Housing and Urban Development ("HUD"), the City and County of San Francisco (the "City"), Mission Housing Development Corporation ("Mission Housing"), and 1010 SVN Associates (collectively "defendants"), challenging the award of federal funding for construction of a four-story, low-income housing project in their neighborhood. Homeowners alleged that defendants had violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4332(2)(C), and 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. 470f. On this appeal, Homeowners contend that defendants failed to comply with certain of the stipulations in a Memorandum of Agreement ("MOA"), entered into pursuant to the statutory scheme. We have jurisdiction under 28 U.S.C. 1291. We affirm the district court's dismissal of HUD, Mission Housing, and 1010 SVN Associates. We hold, however, that plaintiffs have standing against the City. Concluding that there are no remaining problems of justiciablility, we remand for the district court finally to consider the merits of Homeowners' case against the City.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 A 30-unit, four story, low-income housing project has been constructed on the corner of 21st Street and South Van Ness Avenue in the Mission District of San Francisco, California, to house persons with HIV/AIDS and low-to-middle-income tenants ("Van Ness Project"). Four of the plaintiff Homeowners are local owners and residents of homes eligible for inclusion in the National Register of Historic Places ("National Register").[1] Planning for the Van Ness Project began in 1994. The project was funded by private loans, federal and state tax credits, and two HUD programs: the Home Investment Partnerships Program ("HOME") and Housing Opportunities for Persons with AIDS Program ("HOPWA"). HUD committed $1.5 million in HOME funds to the developer through the Mayor's Office of Housing, and $1 million in HOPWA funds through the San Francisco Redevelopment Agency. Both the HOME and HOPWA programs contain environmental review requirements. See 24 C.F.R. Parts 50 & 58. Before receiving the HOME funds, the City assumed responsibility for NHPA and NEPA compliance under the delegation provision of 42 U.S.C. 12838. In relation to the HOPWA funds, HUD retained responsibility for NHPA and the NEPA compliance, as required under 24 C.F.R. 50.10.
 
 A. Statutory and Regulatory Framework
 1. NHPA
 
 4
 Under NHPA, it is the policy of the federal government to "foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations." 16 U.S.C.S 470-1(1). Section 106 of the NHPA requires that whenever a federal agency has "direct or indirect jurisdiction" over a project or program that could affect historic properties, the federal agency must study ways to avoid or mitigate any adverse impacts to those properties. 16 U.S.C. 470f. The agency must afford the Federal Advisory Council on Historic Preservation ("Advisory Council") "a reasonable opportunity to comment." Id.
 
 
 5
 The 106 review process requires the federal agency to: (1) identify the properties that are eligible for listing on the National Register that would be affected by the federal undertaking; (2) determine if the effect could be adverse; and (3) if so, consult with the State Historic Preservation Officer ("SHPO")[2] to develop alternatives to mitigate any adverse effects on the historic properties. See 36 C.F.R. 800.4(b) & (c) & 800.5(e).[3] If the agency and the SHPO agree, they execute a MOA, which must be joined in or approved by the Advisory Council. See 36 C.F.R. 800.5(e)(4), 800.6(a). Where a MOA is executed, it "shall govern the undertaking and all of its parts." 16 U.S.C. 470h-2(l).
 
 2. NEPA
 
 6
 NEPA and the Council on Environmental Quality's implementing regulations, 40 C.F.R. 1500 et seq., require federal agencies to conduct an environmental review of proposed federal actions. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). NEPA requires an agency to prepare a detailed "environmental impact statement" ("EIS") on "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C). These actions include projects implemented by non-federal entities that use federal funding. See 40 C.F.R.S 1508.18. The implementing regulations provide for the preparation of "environmental assessments" ("EA "s), which are concise preliminary evaluations that "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact [(`FONSI')]." 40 C.F.R. 1508.9(a)(1). The regulations provide that "[m]itigation . . . and other conditions established in the environmental impact statement or during [the agency's] review and committed as part of the decision shall be implemented by the lead agency." 40 C.F.R. 1505.3.
 
 B. Factual Background
 
 7
 The City and HUD conducted environmental and historical reviews for the Van Ness Project pursuant to their obligations under the HOME and HOPWA programs. In February 1995, during the course of the NHPA review, the City determined that the Van Ness Project might have an adverse impact on six historic residential properties eligible for inclusion on the National Register, including Homeowners' properties. In April 1995, in order to minimize the potential impact, a binding MOA was entered into by signatories HUD, the City, the Advisory Council, and the California SHPO. Mission Hous-ing and the City's Landmarks Preservation Advisory Board formally concurred in the MOA.
 
 
 8
 Two stipulations of the MOA are at issue in this appeal. Stipulation 5 of the MOA states that:
 
 
 9
 At any time during implementation of the measures stipulated in this Agreement, should an objection to any such measure or its manner of implementation be raised in writing by a member of the public, the City shall take the objection into account and consult as needed.
 
 Stipulation 8 of the MOA states that:
 
 10
 If any of the signatories to this Agreement believes that the terms of this Agreement cannot be carried out, or that an amendment to the terms of the Agreement cannot be carried out, or that an amendment to the terms of the Agreement must be made, that signatory shall immediately notify the other signatories and request consultation to amend this Agreement.
 
 
 11
 In May 1995, the City prepared an EA in the course of the NEPA review for the HOME and HOPWA grants and found that the Van Ness Project could have some impact on the environment and properties. The EA recommended that approval of the Van Ness Project be subject to the MOA as a mitigation measure to alleviate adverse environmental impacts. In response to the EA, the City issued a FONSI and Notice to the Public of Intent to Release Funds for the Project ("Notice"). The Notice stated that an EIS would not be required because the mitigation measures in the MOA would adequately address any adverse effects on the environment. HUD issued its own FONSI for the HOPWA funds, similarly including the MOA as a condition to project approval.
 
 
 12
 The City certified, in June 1995, that it had fulfilled its NEPA and NHPA obligations and formally requested the release of HOME funds. The City and HUD accepted comments on the FONSIs for the HOME and HOPWA funds. HUD then formally released these funds to the City. From November 1995 to July 1996, Mission Housing submitted architectural plans for review to various City planning agencies. Notwithstanding plaintiffs' persistent objections to the scale, color, and materials of the project, the plans were approved. Construction commenced in November 1996, and tenants began occupying the building in April 1998. The Van Ness Project now is fully occupied, with 120 tenants living in 30 units, and has a waiting list of 1,000 persons.
 
 C. Procedural Background
 
 13
 In August 1996, before construction had commenced on the Van Ness Project, plaintiffs filed their complaint against HUD,[4] the City, Mission Housing, and the project owner, 1010 SVN Associates.[5] Plaintiffs alleged violations of NHPA, NEPA, the Administrative Procedures Act ("APA"), the Due Process Clause of the Fourteenth Amendment and 42 U.S.C.S 1983. Plaintiffs requested injunctive and declaratory relief, compensatory and punitive damages, and reasonable fees and costs.
 
 
 14
 In December 1996, the district court granted defendants' motions to dismiss, and denied plaintiffs' application for a temporary restraining order. See Tyler v. Cisneros, No. C-963056-VRW, 1996 WL 723083 (N.D. Cal. Dec. 2, 1996) ("Tyler I"). The district court ruled that the NHPA claims were moot because NHPA contained an "implicit statute of limitations," which barred assertion of the NHPA claims as to both HOPWA and HOME funds after HUD's release of those funds to the City. Id. at *4. In the alternative, under NHPA, the court held that Homeowners' claims failed because HUD no longer exercised continuing authority over the funds. It also ruled that under NEPA, HUD did not exercise authority over the HOPWA funds once they were distributed, and that the claims regarding the HOME funds were moot because plaintiffs could only challenge those during the 15-day comment period preceding allocation. Finally, the district court dismissed Homeowners' claims against the City as a delegatee of the environmental review responsibilities under the HOME program. See id.
 
 
 15
 We reversed the 1996 decision and remanded the case to the district court in February 1998.[6] See Tyler v. Cisneros, 136 F.3d 603, 605 (9th Cir. 1998) ("Tyler II"). We held that NHPA does not contain an implicit statute of limitations, and that "HUD may have some continuing authority because it is a party to the Agreement." Id. at 608. We were clear that "[a]t most, the plaintiffs will be able to enforce an agreement whereby HUD is to engage in consultation. On remand, the district court should decide whether such consultation was indeed warranted." Id. at 609. As to the claims against the City, we concluded that, at the pleading stage, Homeowners have standing through Stipulation 5 of the MOA and remanded for the district court to determine "whether there was any such failure to carry out this stipulation."[7] Id. at 610. We instructed that:
 
 
 16
 On remand, the district court should first address the issue of whether the plaintiffs have standing to enforce the terms of the Agreement. If so, the district court should decide the extent of HUD's and the City's obligations to the plaintiffs under the Agreement and whether these obligations were breached. The district court should also decide how to allocate attorney's fees depending on the resolution of these issues.
 
 
 17
 Id.
 
 
 18
 On remand, the district court granted motions by HUD and the City, joined by Mission Housing and 1010 SVN Associates, to dismiss the action because plaintiffs lacked standing. Examining Article III standing, the district court held that Homeowners had pleaded facts to allege that they suffered an injury in fact and had shown a causal connection between the conduct complained of and the injury. It concluded, however, that plaintiffs had not shown redressability because they did not demonstrate "that it [was] likely that a favorable decision from this court will redress their injuries." The district court stressed that "the project has been completed and that the Ninth Circuit has limited plaintiffs' available causes of action to one based on two consultation provisions of the MOA." Plaintiffs timely appealed.
 
 II. STANDARD OF REVIEW
 
 19
 We review questions of standing de novo. See Douglas County v. Babbitt, 48 F.3d 1495, 1499 (9th Cir. 1995). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Graham v. FEMA, 149 F.3d 997, 1001 (9th Cir. 1998) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (holding that"[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to survive a motion to dismiss). In determining whether a plaintiff can prove facts in support of his or her claim that would entitle him or her to relief, we may consider facts contained in documents attached to the complaint. See Roth v. Garcia Marquez, 942 F.2d 617, 625 n.1 (9th Cir. 1991) (citing Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987)). At the pleading stage, we may affirm on any ground supported by the record. See Tyler II, 136 F.3d at 607.
 
 III. ANALYSIS
 
 20
 To satisfy constitutional standing, plaintiffs bear the burden of showing that they meet three requirements: (1) they suffered an "injury in fact;" (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is "likely," as opposed to "speculative," that the injury will be redressed by a favorable decision. Lujan, 504 U.S. at 560-61 (citations omitted).
 
 A. Standing Against the City[8]
 1. Injury in Fact
 
 21
 An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical. " Id. at 560 (citations and internal quotation marks omitted). The district court found that "[t]he injury in fact that plaintiffs have suffered is damage to their property interests in their homes."
 
 
 22
 Defendants contend that Homeowners made only a general allegation that they would be adversely affected by the Van Ness Project. In their complaint, however, Homeowners specifically alleged that:
 
 
 23
 The Proposed Project will adversely affect the Historic Properties by diminishing the integrity of the Historic Properties' location, design, setting, and feeling and by introducing visual and atmospheric elements that are out of scale, and character, with the Historic Properties. Furthermore, the Proposed Project's height, bulk and lack of set-backs will over shadow and diminish the Historic Properties, thus introducing atmospheric elements that are out of character with the Historic Properties.[9]
 
 
 24
 We may also look to documents supporting the complaint in determining the scope and specifics of Homeowners' claim. See Roth, 942 F.2d at 625 n.1. In plaintiff Tyler's declaration, he stated that Homeowners were concerned about the effects of the Van Ness Project on their neighborhood, because of "excessive building height, excessive building bulk, overall number of units, need for setbacks, restriction on future lot split, inadequate parking spaces, and building design and materials." Given that plaintiffs' homes are directly affected by changes to structures in the neighborhood, we conclude that they have adequately established an injury in fact for purposes of Article III standing in relation to the City. Cf. Lujan, 504 U.S. at 565-66 (holding that "a plaintiff claiming injury from environmental damage must use the are a affected by the challenged activity") (citation omitted).
 
 2. Causation
 
 25
 We hold as well that plaintiffs have established the second requirement of constitutional standing by showing a causal connection between their injury and the City's conduct. Causation requires that the injury be "fairly traceable to the challenged action of the defendant, and [is] not the result of the independent action of some third party not before the court." Virginia Sur. Co. v. Northrop Grumman Corp., 144 F.3d 1243, 1246 (9th Cir. 1998) (citing Lujan, 504 U.S. at 560 (citation and internal quotation marks omitted)).
 
 
 26
 We conclude that this case is different from Warth. In Warth, petitioners sued the Town of Penfield, alleging that a zoning ordinance had the purpose and effect of excluding people of low and moderate incomes from the housing market. The Supreme Court found that petitioners' inability to reside in the town was a result of economies of scale and individual financial situations, rather than the zoning ordinance. See 422 U.S. at 506. The Court concluded that,"the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and petitioners' asserted injury." Id. at 507.
 
 
 27
 In Warth, the link between plaintiffs' injury and defendants' actions was so tenuous that plaintiffs could not show causation. In the case at bench, however, the injury to Homeowners, who reside in historic homes in the Mission District, is fairly traceable to the City's actions in constructing the Van Ness Project, allegedly in violation of its obligation in Stipulation 5 of the MOA to consult with the public. See Lujan, 504 U.S. at 560. We conclude that Homeowners have adequately shown that the City's actions in accepting federal funding, issuing environmental reports, and assisting with construction of the Van Ness Project establish a causal connection to the injury to Homeowners' properties.
 
 3. Redressability
 
 28
 Under the third constitutional standing requirement, Homeowners must show that their injury is redressable; that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Bennett v. Spear, 520 U.S. 154, 167 (1997) (citing Lujan, 504 U.S. at 560-61). With regards to the City, Homeowners have met this burden. Homeowners claim that the " `redress' which plaintiffs seek is not the demolition of the housing project, but rather, compliance with the terms of the MOA, including the consultations required by the MOA if `members of the public' believe that its terms are not being carried out."
 
 
 29
 We conclude that plaintiffs have standing against the City under Stipulation 5 of the MOA, which requires the City to "take the objection into account and consult as needed" with respect to any objection "by a member of the public" to the manner in which the MOA is being implemented.
 
 
 30
 The district court concluded that "plaintiffs provide the court with no reason to believe that requiring . . . the City to honor the consultation provisions, if indeed [it has] not already done so, would be likely to result in a new color scheme, different landscaping or any other change to the Van Ness Project." The district court should not have pre-judged the outcome of consultation entered into pursuant to Stipulation 5 of the MOA. See Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir. 1994) ("[T]he mere fact that, on remand, the Secretary might again issue a waiver does not defeat plaintiffs' standing."). As stated by the District of Columbia Circuit, "[w]hether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that the will succeed on the merits." Louisiana Energy & Power Auth. v. Federal Energy Regulatory Comm'n, 141 F.3d 364, 368 (D.C. Cir. 1998) (citation and internal quotation marks omitted).
 
 
 31
 The case at hand differs from Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976), in which the Supreme Court held that the plaintiffs lacked standing to challenge a ruling of the Internal Revenue Service that gave favorable tax treatment to nonprofit hospitals that provided only emergency-room services to indigents. The Court held that decisions of the hospitals may have been made without regard to tax implications. See id. at 42-43. The district court concluded that "[m]uch as the hospitals involved in Simon might have continued to deny treatment to indigent patients in spite of an order striking down the contested revenue ruling, it seems as likely as not that . . . the City would continue to refuse plaintiffs' requests in spite of an order from this court requiring consultation." In pre-judging the outcome, however, the district court overlooked the close connection between the parties in this case. In Simon, there was only an attenuated connection between plaintiffs' injuries and the relief being sought because hospitals could choose not to care for indigent individuals rather than getting tax benefits. Here, consultation would require the assertedly injured Homeowners and representatives of the City, which caused the injury, to sit down together in a face-to-face meeting. Plaintiffs could, conceivably, directly impact the City's decisions.
 
 
 32
 The Fifth Circuit provided a well-reasoned analysis in Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown, 948 F.2d 1436, 1446-47 (5th Cir. 1991). In Vieux Carre, plaintiff property owners sued the Army Corps of Engineers concerning the construction of a riverside park which was potentially subject to NHPA review, even though the park was already complete. The Fifth Circuit determined that the action was not moot even though only smaller changes could still be made, compared to the broader relief plaintiffs initially sought. While Vieux Carre discussed mootness rather than redressability, we find its language instructive:
 
 
 33
 At this point . . . it is impossible for us to know with any degree of certainty just what the end result of the NHPA process would be. For example, NHPA review could result in a determination . . . that at this late date nothing can be done, or should be done, to mitigate the adverse effects of the park project on the historic properties . . . . We find it inappropriate to pre-judge those results as being limited to the extremes of either maintaining the status quo or totally demolishing the park.
 
 
 34
 Therefore, a district court should not pre-judge the result of the NHPA process by concluding that no relief is possible. . . . Even though, in this NHPA case, Vieux Carre's possible relief may appear to some to be irrelevant, trivial, or prohibitively expensive, a district court should beware of shortcutting the process which has been committed in the first instance to the responsible federal agency.
 
 
 35
 Id. (footnotes and internal quotation marks omitted). Likewise, we will not pre-judge the outcome of any consultations between the City and Homeowners engaged in pursuant to Stipulation 5.
 
 4. Contract Arguments
 
 36
 The City argues that Homeowners cannot enforce the MOA because they lack privity of contract and are not intended beneficiaries of the MOA. The MOA is a contract and the City is bound by its terms. See Citizens' Comm. for Envt'l Protection v. United States Coast Guard, 456 F. Supp. 101, 115 (D.N.J. 1978). Federal law controls the MOA's interpretation because it was entered into pursuant to a federal scheme and HUD is a party. See Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 2000) (holding that federal law controls the interpretation of a contract entered into pursuant to federal law when the United States is a party). "The interpretation of a contract is a mixed question of law and fact subject to de novo review. In particular, the determination of whether contract language is ambiguous is a question of law." Id. (citation omitted).
 
 
 37
 Stipulation 5 of the MOA specifically provides that if a "member of the public" makes a written complaint, "the City shall take the objection into account and consult as needed with the objecting party." While Homeowners were not signatories to the MOA, Stipulation 5 specifically provides that objections can be raised by members of the public. See Waterford Citizens' Ass'n v. Reilly, 970 F.2d 1287, 1290 (4th Cir. 1992) (holding that a citizen's association had standing to enforce the provisions of a MOA for a nearby sewer, even when it was neither a party to nor mentioned in the MOA). In Tyler II, we distinguished Citizens' Committee, 456 F. Supp. at 115, by noting that there "the court held that plaintiffs could not enforce an Agreement entered into for purposes of NEPA when they were not signatories to it, nor mentioned in it . . . . Here, however, the public's right to bring objections is specifically mentioned in the Agreement." Tyler II, 136 F.3d at 610 (citation omitted).
 
 
 38
 The City nonetheless argues that Homeowners do not have standing to challenge the MOA because they are not third-party beneficiaries. See Helfand v. Gerson , 105 F.3d 530, 538 (9th Cir. 1997) ("Courts have extended the right to sue for breach of contract to intended third-party beneficiaries."). "Before a third party can recover under a contract, it must show that the contract was made for its direct benefit -that it is an intended beneficiary of the contract. " Klamath Water Users, 204 F.3d at 1210. Although Homeowners were not concurring parties to the MOA, this is not conclusive as a matter of law to show that they were not intended beneficiaries, especially since the public is specifically referenced in Stipulation 5. See 36 C.F.R. 800.5(e)(4) (1986); Klamath Water Users, 204 F.3d at 1210. It would appear that Stipulation 5's reference to the public would include Homeowners and, thus, that Homeowners have standing as third-party beneficiaries to the MOA.
 
 
 39
 We conclude that Homeowners have adequately alleged Article III standing as against the City under Stipulation 5.[10] They have also adequately alleged standing to survive the City's contract-based arguments on a motion to dismiss.
 
 B. Standing Against HUD
 
 40
 We hold that Homeowners do not have standing to sue HUD. We specifically held in Tyler II that:
 
 
 41
 HUD's obligation did not extend further than the terms of the Agreement because the environmental review process was complete and the plaintiffs have no quarrel with the adequacy of those reviews. At most, the plaintiffs will be able to enforce an agree ment whereby HUD is to engage in consultation.
 
 
 42
 Tyler II, 136 F.3d at 609 (emphasis added) (citation omitted). Stipulation 8 of the MOA states that:
 
 
 43
 If any of the signatories to this Agreement believes that the terms of this Agreement cannot be carried out, or that an amendment to the terms of the Agreement cannot be carried out, or that an amendment to the terms of the Agreement must be made, that signatory shall immediately notify the other signatories and request consultation to amend this Agreement.
 
 
 44
 We conclude that the MOA alone is not an adequate basis, as a matter of law, to hold HUD liable for NEPA or NHPA violations. There is neither a causal connection between the injury and the conduct complained of nor is there any redressability in relation to HUD. Under Stipulation 8, only signatories to the MOA can request consultation and any consultation held would only be between the signatories. Stipulation 8 does not afford Homeowners the opportunity either to call for or to be part of any consultations. In these respects, Stipulation 8 differs from Stipulation 5 in that the latter permits the public to raise objections and, arguably, requires the City to consult with the objecting members of the public.
 
 
 45
 We read Tyler II to preclude our consideration of any obligation imposed upon HUD under the statutes or regulations because Tyler II explicitly limits HUD's potential liability to the terms of the MOA. See Tyler II, 136 F.3d at 609. Under 36 C.F.R. 800.6(c), "[t]he Agency Official shall ensure that the undertaking is carried out in accordance with the Memorandum of Agreement." Under 40 C.F.R. 1505.3, mitigation established during review of the EIS "and committed as part of the decision shall be implemented by the lead agency." Even assuming that these regulations could reasonably be interpreted to impose upon HUD the duty to insure that the other signatories to the MOA meet their obligations thereunder, the law of the case bars consideration of such regulation based arguments.[11] See Agostini v. Felton, 521 U.S. 203, 236 (1997) (citing Messenger v. Anderson, 225 U.S. 436, 444 (1912)) (holding that under the law of the case doctrine, "a court should not reopen issues decided in earlier stages of the same litigation"); Aleman v. Glickman, 217 F.3d 1191, 1199 (9th Cir. 2000) ("Were this court addressing the issue on a `clean slate,' such an argument may have merit . . . . However, the slate is not clean.") (internal quotation marks and citation omitted). We, therefore, conclude that the MOA alone cannot provide a basis for standing against HUD.
 
 
 46
 First, there simply is not an adequate causal connection between Stipulation 8 and the asserted injury. See Regents of the Univ. v. Shalala, 82 F.3d 291, 298 (9th Cir. 1996) (holding that the alleged injury and conduct of defendants were "too attenuated to establish standing"); see also Warth, 422 U.S. at 504-07. Any benefit Homeowners received from consultations under Stipulation 8 would only derive from the action of another signatory in requesting consultation. See Virginia Sur., 144 F.3d at 1246 (holding that causation cannot arise from the independent action of a third party). Even if consultation were requested by a signatory under Stipulation 8, it is highly speculative that the signatories would ultimately agree to amend the MOA in a manner benefitting Homeowners. See Lujan, 504 U.S. at 560-61; Simon, 426 U.S. at 42-43.
 
 
 47
 Not only is there no standing against HUD based on Stipulation 8 under traditional Article III standing, but Stipulation 8 does not even provide a basis for procedural standing because it in no way accords Homeowners any "procedural right to protect [their] concrete interest. " Churchill County, 150 F.3d at 1078.
 
 
 48
 C. Claims Against Mission Housing and 1010 SVN Associates
 
 
 49
 We conclude, as well, that the district court properly dismissed defendants Mission Housing and 1010 SVN Associates. There is no standing against Mission Housing because plaintiffs have not adequately alleged facts to establish either causation or redressability. While Mission Housing concurred in the MOA, it was not a signatory. Mission Housing's only connection to the Van Ness Project was submitting architectural plans to the City. This connection simply is too attenuated to grant standing to the Homeowners. See Regents of the Univ., 82 F.3d at 298. Unlike the City, Mission Housing is not specifically obligated to confer with the public in Stipulation 5 or anywhere else in the MOA. Given that Stipulation 8 does not establish standing against HUD, a signatory to the MOA, it certainly is not adequate to confer standing against Mission Housing. See Simon, 426 U.S. at 42-45; Warth, 422 U.S. at 507. For all of these reasons, Homeowners cannot establish standing against Mission Housing.
 
 
 50
 Further, Homeowners have not stated any claim for relief against 1010 SVN Associates, the owner of record of the Van Ness Project property. See Tyler II, 136 F.3d at 607 (holding that a complaint should be dismissed if it does not allege facts that would entitle a plaintiff to relief). 1010 SVN Associates did not join the MOA as a signatory or a concurring party. 1010 SVN Associates is not even mentioned in the MOA. See Citizens' Comm., 456 F. Supp. at 115 (holding that plaintiffs who were neither signatories to nor mentioned in a MOA "lack the contractual and constitutional standing required"). Homeowners have simply failed to state any claim against 1010 SVN Associates.
 
 D. Mootness
 
 51
 We hold that the case against the City is not moot; there is a live controversy and the parties have a cognizable interest in the outcome. See H.C. ex rel. Gordon v. Koppel, 203 F.3d 610, 612 (9th Cir. 2000) (citing Murphy v. Hunt , 455 U.S. 478, 481 (1982)) ("A case is moot where the issues before the court no longer present a live controversy or the parties lack a cognizable interest in the outcome of the suit.").
 
 
 52
 The City argues that the case is moot because the project is complete and this court cannot grant effective relief. We disagree because changes can still be made to help alleviate any adverse effects. See Vieux Carre, 948 F.2d at 1447 ("We find it inappropriate to pre-judge the results as being limited to the extremes of either maintaining the status quo or totally demolishing the park."). We find this case different from Fair v. United States EPA, 795 F.2d 851 (9th Cir. 1986), relied on by the City. In Fair, we held that a challenge to the withholding of funds for a sewer project, pending further study, was moot because 70% of the funds were already distributed and the sewer was complete. See id. at 854-55. Although the Van Ness Project has been built and is occupied, modifications can still be made. See Vieux Carre, 948 F.2d at 1446-47. Home-owners are correct that "viable revisions to the project's color and materials, among other things, can still be made which can still substantially reduce the project's incompatibility with plaintiffs' homes." Homeowners are not asking that the Van Ness Project be reconstructed. Changes to the structure could still minimize any adverse impacts on their properties. We hold that the case against the City presents a live controversy and, therefore, is not moot.
 
 CONCLUSION
 
 53
 We affirm the district court's dismissal of HUD, Mission Housing and 1010 SVN Associates. We reverse the dismissal of Homeowner's claims against the City under Stipulation 5 of the MOA and remand for further proceedings consistent with this opinion. Mission Housing, 1010 SVN Associates, and HUD shall recover from plaintiffs their respective costs on appeal. Homeowners and the City shall bear their own costs on appeal.
 
 
 54
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 
 Notes:
 
 
 [1]
 In addition, the remaining plaintiff, Solow, is the owner/occupant of residential property located at 647 Shotwell Street in San Francisco, which is near the site of the Van Ness Project.
 
 
 [2]
 The SHPO is the state official responsible for assisting federal agencies in carrying out their historic preservation responsibilities under 16 U.S.C.S 470(b), and is involved with the 106 consultation process.
 
 
 [3]
 On June 15, 1999, revised regulations, 36 C.F.R. 800 et seq., implementing 106 became effective. All citations in this opinion are to the regulations that were in effect prior to June 15, 1999, when the parties executed and commenced implementing the MOA.
 
 
 [4]
 The action was filed against Henry G. Cisneros, then HUD Secretary. Andrew M. Cuomo, as his successor, has been substituted as a defendant in his place.
 
 
 [5]
 Other defendants originally named have been dismissed, including the California Department of Parks and Recreation, and Vincent Marsh, Secretary of the San Francisco Landmarks Preservation Advisory Board.
 
 
 [6]
 In Tyler II, plaintiffs did not appeal the district court's dismissal for failure to state a claim on the grounds that the City had violated Stipulation 1 of the MOA and NHPA's implementing regulations by failing to resubmit the Project to the Advisory Council, and had violated the preamble of the MOA by failing to consider comments by plaintiffs and other interested persons. In addition, plaintiffs appealed neither the district court's ruling that the APA claims failed nor its dismissal of the due process and 1983 claims. Plaintiffs also did not dispute the adequacy of the pre-disbursement reviews. See Tyler II, 136 F.3d at 607 n.2, 609-10. All of these arguments have been waived. See American Ad Management, Inc. v. General Tel. Co. of Cal., 190 F.3d 1051, 1054 n. 2 (9th Cir. 1999) ("American waived its other antitrust claims in its prior appeal when it did not challenge their dismissal by the district court."); see also SIPC v. Vigman, 74 F.3d 932, 936-37 (9th Cir. 1996) (holding that a party cannotrevisit issues that it abandons on appeal).
 
 
 [7]
 We also concluded that Homeowners' claim that the City violated regulations governing the review process under NHPA was moot because the review process ended when the Advisory Council accepted the MOA. See 136 F.3d at 610 n.3.
 
 
 [8]
 In Tyler II, we indicated that plaintiffs' harms may be redressable against the City under the regulations, see 136 F.3d at 609, or under the MOA, see id. at 610. If a choice is necessary, that choice need not be made now. For this reason, however, we analyze plantiffs' standing in the alternative, first, under Article III, then under contract principles.
 
 
 [9]
 We note that, during the long pendency of this litigation, plaintiffs have never amended their complaint to make their alleged injury any more specific.
 
 
 [10]
 Plaintiffs also argue that they have procedural standing under the MOA. See Churchill County v. Babbitt, 150 F.3d 1072, 1077 (9th Cir.) ("Procedural standing is standing based on a plaintiff's procedural injury."), amended by, 158 F.3d 491 (9th Cir. 1998). To establish procedural standing, "[t]he requisite weight of proof for each element of the [standing] test is lowered." Id. Under the Ninth Circuit test for procedural standing, a plaintiff must show: "(1) that it has been accorded a procedural right to protect its concrete interests, and (2) that it has a threatened concrete interest that is the ultimate basis of its standing. " Id. at 1078 (citing Douglas County, 48 F.3d at 1500-01). Plaintiffs must also "show that his interest falls within the `zone of interests' that the challenged statute is designed to protect." Douglas County, 48 F.3d at 1500-01 (citation omitted). Because Homeowners have established standing against the City under a substantive standing analysis, we need not engage in the procedural standing inquiry.
 
 
 [11]
 We hold that Tyler II forecloses any argument under 40 C.F.R. 1505.3 (NEPA) and 36 C.F.R. 800.6 (NHPA), and plaintiffs have identified no other provision in the statutory and regulatory schemes that require HUD to insure that the MOA is complied with by other signatories.